# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| BETH SARVER ASHWORTH, on behalf of herself and others similarly situated, | Case No. 6:25-CV-01470-JSS-LHP |
| *Plaintiff,* | Hon. Julie S. Sneed |
| v. | |
| STOCKX LLC, | |
| *Defendant.* | |

## DEFENDANT STOCKX LLC'S MOTION TO COMPEL ARBITRATION WITH INCORPORATED MEMORANDUM OF LAW

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND .................................................................2

    I.    Plaintiff Agreed To StockX's Terms And Accompanying Arbitration Agreement When She Created Her StockX Account In September 2024. ...................................................2

    II.    The Terms Contain An Express Arbitration Agreement And Class Action Waiver ..........................................................4

    III.    Plaintiff Separately Agreed To StockX's SMS Terms Of Service When She Signed Up To Receive Text Messages. ............6

ARGUMENT ........................................................................................8

    I.    The Court Should Compel Arbitration Of Plaintiff's Claims. .......8

        A.    The FAA Codifies A Strong Preference For Arbitration..............................................................8

        B.    StockX And Plaintiff Agreed To Arbitrate. ...................... 10

            1.    State-Law Principles Govern Contract Formation. ................................................ 10

            2.    StockX's Hybrid Browsewrap Agreement Provides Reasonably Conspicuous Notice Of StockX's Terms........................................... 12

            3.    Plaintiff Unambiguously Assented To StockX's Terms And StockX's SMS Terms – Both Of Which Contain A Valid Arbitration Agreement....... 18

    II.    The Arbitrator, Not This Court, Is Charged With Deciding Whether This Dispute Falls Within The Scope Of The Parties' Arbitration Agreement. ................................... 21

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Adams v. Lashify, Inc.*,
689 F. Supp. 3d 1146 (M.D. Fla. 2023) ............................................. 9, 10, 16

*Airbnb, Inc. v. Doe*,
336 So. 3d 698 (Fla. 2022) ............................................................. 23

*Attix v. Carrington Mortg. Servs., LLC*,
35 F.4th 1284 (11th Cir. 2022) ....................................................... 23

*Bell v. Royal Seas Cruises, Inc.*,
2020 WL 5639947 (S.D. Fla. Sept. 21, 2020) ............................................. 16

*Bryant v. Rich*,
530 F.3d 1368 (11th Cir. 2008) ........................................................ 9

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) ................................................................... 22

*Collado v. J. & G. Transp., Inc.*,
820 F.3d 1256 (11th Cir. 2016) ........................................................ 8

*Dasher v. RBC Bank (USA)*,
745 F.3d 1111 (11th Cir. 2014) ........................................................ 8

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ................................................................... 8

*Derriman v. Mizzen & Main LLC*,
710 F. Supp. 3d 1129 (M.D. Fla. 2023) ...........................................*passim*

*Falcon v. TelevisaUnivision Digital, Inc.*,
2024 WL 1492831 (M.D. Fla. Mar. 29, 2024) ........................... 12, 14, 15, 16

*Fontanez v. Whaleco, Inc.*,
No. 53-2023CA-374, Order Granting Defendant's Motion to Compel
Arbitration (Fla. Cir. Ct. Aug. 29, 2023) ............................................. 18, 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .................................................................... 24

*Jones v. Waffle House, Inc.,*
866 F.3d 1257 (11th Cir. 2017)................................................................ 23

*Kravets v. Anthropologie, Inc.,*
2022 WL 1978712 (S.D. Fla. June 6, 2022) ........................................ 19, 21

*Lamonaco v. Experian Info. Sols., Inc.,*
141 F.4th 1343 (11th Cir. 2025) ...................................................... 10, 11, 22

*Lawrence v. Dunbar,*
919 F.2d 1525 (11th Cir. 1990)................................................................9

*Massage Envy Franchising, LLC v. Doe,*
339 So. 3d 481 (Fla. 5th DCA 2022) ...................................................... 10

*MetroPCS Commc'ns, Inc. v. Porter,*
273 So. 3d 1025 (Fla. 3d DCA 2018) .................................................. 11, 12

*Miami Dolphins, Ltd. v. Engwiller,*
410 So. 3d 685 (Fla. 3d DCA 2025) ................................................ 11, 12, 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ................................................................................ 24

*Newton v. Experian Info. Sols., Inc.,*
No. 24-12398, 2025 WL 2102084 (11th Cir. July 28, 2025)........................9

*Orellana v. Roblox Corp.,*
769 F. Supp. 3d 1273 (M.D. Fla. 2025) .................................................. 23

*P&S Bus. Machs., Inc. v. Canon USA, Inc.,*
331 F.3d 804 (11th Cir. 2003)................................................................ 10

*Rainey v. A Place for Rover, Inc.,*
2022 WL 16942849 (C.D. Cal. July 18, 2022) ............................................ 17

*Rent-A-Center, W., Inc. v. Jackson,*
561 U.S. 63 (2010) .............................................................................. 22

*Rogolino v. Walmart, Inc.,*
2025 WL 396453 (S.D. Fla. Feb. 4, 2025) ............................................ 8, 18

*Selden v. Airbnb,*
4 F.4th 148 (D.C. Cir. 2021) .................................................................. 17

*Smith v. Spizzirri,*
    601 U.S. 472 (2024) ................................................................ 25

*Solymar Invs., Ltd. v. Banco Santander S.A.,*
    672 F.3d 981 (11th Cir. 2012) ................................................ 11

*Specht v. Netscape Commc'ns Corp.,*
    306 F.3d 17 (2d Cir. 2002) ..................................................... 14

*In re StockX Customer Data Sec. Breach Litig.,*
    19 F.4th 873 (6th Cir. 2021) .................................................. 24

*Matter of T&B Gen. Contracting, Inc.,*
    833 F.2d 1455 (11th Cir. 1987) .............................................. 15

*Temple v. Best Rate Holdings LLC,*
    360 F. Supp. 3d 1289 (M.D. Fla. 2018) .................... 14, 16, 18, 24

*Valiente v. StockX, Inc.,*
    645 F. Supp.3d 1331 (S.D. Fla. 2022) .................................... 24

*Vitacost.com, Inc. v. McCants,*
    210 So. 3d 761 (Fla. 4th DCA 2017) ...................................... 17

## <u>Statutes & Rules</u>

9 U.S.C. § 4 ........................................................................................ 8

Fed. R. Civ. P. 12(b)(1) ................................................................ 9, 25

Fla. Stat. § 682.02(1) (2022) .......................................................... 10

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, Defendant StockX LLC ("StockX") hereby respectfully moves this Court to enter an Order compelling arbitration of Plaintiff Beth Sarver Ashworth's claims brought in the Class Action Complaint (ECF No. 1) ("Complaint"), as required by her binding arbitration agreement with StockX.

## **INTRODUCTION**

The single Telephone Consumer Protection Act ("TCPA") claim brought against StockX is ripe for dismissal for clear and important reasons.  Simply put, Plaintiff Beth Sarver Ashworth ("Plaintiff") entered a valid and binding agreement to arbitrate "any and all" claims against StockX on an individual, non-class action basis – not through this putative Rule 23 class action.  The Court properly should respect the parties' contractual choice, as well as the strong policy preferences for private arbitration, and compel resolution of Plaintiff's claim before the American Arbitration Association ("AAA").

The parties clearly formed a valid contract to arbitrate under Florida law.  StockX's Terms of Use satisfy the enforceability test applicable in the Eleventh Circuit.  As is clear from the declaration of Alan McGrath, Plaintiff: (i) received reasonable notice of StockX's then-operative Terms of Use when she signed up for an account and opted in to receive text messages on StockX's website, and (ii) manifested assent to StockX's Terms of Use – *including its*

*arbitration agreement* – by affirmatively clicking a button that constituted her binding acceptance of such Terms.  The contract-formation issue is dispositive.

The Court need not consider whether the parties' agreement covers this dispute because they delegated any issue over the scope or applicability of their arbitration agreement to an arbitrator in the first instance – not to this or any other court.  That delegation clause is in plain English – it is "clear and unmistakable" – and enforceable.  Where, as here, the parties entered an effective arbitration agreement and expressly delegated issues of arbitrability, the Court should compel arbitration now without delving any further.

But even if the Court assessed the scope of the arbitration agreement, it clearly covers this dispute.  The parties broadly agreed to arbitrate any and all disputes relating to the use of StockX's websites or services.  And Plaintiff's TCPA claim stems from alleged receipt of unsolicited text messages.  In short, this claim falls squarely within the broad scope of her arbitration agreement. The Court should grant StockX's motion to compel so her TCPA claim can be resolved in the parties' agreed forum on an individual, non-class action basis.

## FACTUAL BACKGROUND

I.  **Plaintiff Agreed To StockX's Terms And Accompanying Arbitration Agreement When She Created Her StockX Account In September 2024.**

StockX provides an online platform – via www.stockx.com – that operates as a live marketplace where users can buy and sell limited edition

sneakers, watches, handbags, clothing, and numerous other consumer goods. Complaint ¶ 16; Ex. 1, Declaration of Alan McGrath ("Decl.") ¶ 3.  To buy or sell an item through the StockX platform – or even just bid on such items – each user must create a StockX account and agree to the Terms and Conditions of Use ("Terms").  Decl. ¶ 7 & Ex. B.  In order to create a StockX account, each user must complete the registration process, either on a web browser or mobile app, which involves manually and affirmatively clicking a button confirming the user agrees to the Terms and Privacy Policy.  *Id.* ¶¶ 8–9.  When a user first registers for a StockX account, the user is immediately shown a "Sign Up" screen containing a message that states: "I have read and agree to the <u>Terms and Conditions</u> and <u>Privacy Policy</u>."  *Id.* ¶ 8 & Ex. B at 1.  The phrase "Terms and Conditions" is an active hyperlink and is underlined, clearly indicating that it is a hyperlink that can be clicked on to view a copy of the Terms.  *Id.* ¶ 12.  When a user clicks on that hyperlink, a new web browser window opens up displaying the entire text of StockX's operative Terms.  *Id.*  Below the disclosure of Terms, the user can sign up – and assent to the Terms – either by (i) inputting their email address into the website and clicking the "Sign Up" button, or (ii) signing up via an existing social account, such as Apple or Google, by clicking a button displaying that platform's icon.  *Id.* ¶¶ 8–9 & Ex. B at 1.

Plaintiff first registered with and created a StockX account on September 2, 2024 via her Apple social account.  *Id.* ¶ 10.  After seeing the

message stating, "I have read and agree to the <u>Terms and Conditions</u> and <u>Privacy Policy</u>," Plaintiff clicked the Apple icon below this disclosure and was directed to a new webpage instructing her to input the email address or phone number associated with her Apple account to sign up, thereby creating a StockX account. *Id.* ¶ 11 & Ex. B at 1–2. Plaintiff then clicked the blue "Continue" button to be directed to another webpage where she entered and submitted her Apple login information. *Id.*, Ex. B at 2–3. It is only after this submission of her Apple login information that her StockX account was created. *Id.* ¶ 11. As such, Plaintiff agreed to the Terms when she registered for an account, and she had the opportunity to review the Terms before clicking the Apple icon and affirmatively assenting to those Terms. *Id.* ¶¶ 10–15.

## II.  The Terms Contain An Express Arbitration Agreement And Class Action Waiver.

Plaintiff expressly agreed to the Terms when she created her StockX account on September 2, 2024. *Id.* Indeed, Plaintiff agreed the Terms govern how claims between users and StockX are resolved, including "an obligation to arbitrate certain claims through binding and final arbitration." *Id.* ¶ 19. The Terms contain an express arbitration agreement that states, in pertinent part:

> You and StockX agree that any claim or dispute at law or equity that has arisen or may arise between us relating in any way to or arising out of the Terms or your use of, or access to, the Services, will be resolved in accordance with the provisions set forth in this Section 14. PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR RIGHTS AND WILL HAVE A SUBSTANTIAL IMPACT ON HOW CLAIMS YOU AND STOCKX HAVE AGAINST EACH OTHER ARE RESOLVED.

-4-

. . . .

**You and StockX each agree that any and all disputes or claims that have arisen or may arise between you and StockX relating in any way to or arising out of the Terms or your use of or access to the Services, shall be resolved exclusively through final and binding arbitration, rather than in court**.  Alternatively, you may assert your claims in small claims court, if your claims qualify and so long as the matters remains in such court and advances only on an individual (non-class, nonrepresentative) basis.  The FAA governs the interpretation and enforcement of this Agreement to Arbitrate.

IN ALL EVENTS, EACH PARTY HEREBY KNOWINGLY, VOLUNTARY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THESE TERMS OR YOUR USE OF OR ACCESS TO THE SERVICES. THE PARTIES FURTHER AGREE THAT, IF AND TO THE EXTENT THIS AGREEMENT TO ARBITRATION DOES NOT APPLY TO ANY CLAIM, THAT CLAIM WILL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Terms, Decl., Ex. A § 14 (emphasis added).

Besides encompassing any and all disputes between Plaintiff and StockX, the arbitration agreement also expressly delegates all questions of arbitrability to the arbitrator.  *Id.* § 14.  In pertinent part, Section 14(b) states:

All issues are for the arbitrator to decide, except that issues relating to the interpretation or enforceability of the CLASS ACTION WAIVER will be resolved by a court of competent jurisdiction.  Other than issues related to the CLASS ACTION WAIVER, ***the arbitrator***, and not any federal, state, or local court or agency, **shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of the Terms** including, but not limited to, any claim that all or any part of this Agreement to Arbitrate or the Terms is void or voidable.

*Id.* (emphasis added); *see also* Decl. ¶ 21.

The Terms also specify that the arbitration will be conducted according to the American Arbitration Association's Consumer Arbitration Rules. *Id.* Accordingly, Plaintiff agreed that any questions regarding the scope of the arbitration agreement, and whether it applies to alleged claims, would be resolved by an arbitrator. Further, Plaintiff agreed to bring claims "only on an *individual basis*," and "not as a Plaintiff or class member in any purported class, representative, or private attorney general action or proceeding." *Id.* § 14(a) (emphasis added).

## III. Plaintiff Separately Agreed To StockX's SMS Terms Of Service When She Signed Up To Receive Text Messages.

If a user signs up for a StockX account through a social account, such as Apple or Google, they are also directed to an SMS Notification pop-up. Decl. ¶ 16 & Ex. B at 4. Within that pop-up, the user can manually input their mobile phone number to receive text messages from StockX. *Id.* Just below the mobile phone number field is a clickable box next to a disclaimer stating that by providing his or her phone number, the user agrees "to receive marketing text messages from StockX at the number provided above, and that these texts may be sent using an autodialer." *Id.* The user cannot submit the request to receive text messages without checking this box. *Id.*

Beneath the clickable box and disclaimer, there are also hyperlinks to the Terms of Service and Privacy Policy. *Id.* ¶ 17 & Ex. B at 4. The phrase

"Terms of Service" is an active hyperlink and is underlined indicating that it is a hyperlink that can be clicked on to view a copy of the SMS Terms of Service ("SMS Terms"). *Id.* When a user clicks on that hyperlink, a new web browser window opens up displaying the entire text of StockX's SMS Terms. *Id.* ¶ 17 & Ex. C. The SMS Terms contain an arbitration provision that is materially identical to that of StockX's Terms and Conditions of Use. *Compare id.*, Ex. C § 5, *with id.*, Ex. A § 14. At the bottom of the pop-up, below the disclaimer and SMS Terms hyperlink, is an "Agree" button the user must click – in addition to entering their phone number and checking the disclaimer box – to submit their request to receive text messages from StockX and agree to the SMS Terms. *Id.* ¶ 16 & Ex. B at 4. If the user enters his or her phone number, checks the box, and clicks the "Agree" button, the user will immediately receive an automated text message to their provided phone number confirming their request to receive automated text messages from StockX. *Id.* & Ex. B at 5.

On September 2, 2024, the same day that Plaintiff created her StockX account and assented to the Terms, she also opted-in to receive text messages from StockX and assented to the SMS Terms. *Id.* ¶ 18. Plaintiff entered her mobile phone number into the SMS notification pop-up's field, checked the clickable box, and clicked the "Agree" button affirming her assent. *Id.* She also had the opportunity to review the SMS Terms prior to consenting to receive text messages from StockX. *Id.* ¶ 17 & Ex. B at 4. And, Plaintiff could

-7-

not have opted in to receive text messages without *first* creating a StockX account by following the sign-up processes described above. *Id.* ¶¶ 9–18.

**ARGUMENT**

**I.    The Court Should Compel Arbitration Of Plaintiff's Claims.**

**A.    The FAA Codifies A Strong Preference For Arbitration.**

Section 4 of the Federal Arbitration Act ("FAA") empowers district courts to compel arbitration when the court "is satisfied that the making of the agreement for arbitration or the failure to comply therewith is not [a]n issue." 9 U.S.C. § 4.  Pursuant to this mandate, "[f]ederal policy strongly favors enforcing arbitration agreements." *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256, 1259 (11th Cir. 2016).  The FAA thus creates a "presumption of arbitrability" whereby "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014).  When a party fails, neglects, or refuses to comply with an arbitration agreement, "the FAA requires the federal court to compel arbitration upon proper motion." *Rogolino v. Walmart, Inc.*, 2025 WL 396453, at *2 (S.D. Fla. Feb. 4, 2025) (citing 9 U.S.C. § 4); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (observing that the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed") (emphasis in original).

-8-

Courts in the Eleventh Circuit treat a motion to compel arbitration as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule 12(b)(1). *See, e.g.*, *Adams v. Lashify, Inc.*, 689 F. Supp. 3d 1146, 1153 (M.D. Fla. 2023) (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). This motion to compel constitutes a "factual attack" on federal jurisdiction because it "require[s] reliance on an extrinsic document which might deprive a court of its power to adjudicate a plaintiff's claim." *Adams*, 689 F. Supp. 3d at 1153; *see also Bryant v. Rich*, 530 F.3d 1368, 1373–74 (11th Cir. 2008) (stating "the district judge did not err by acting as a factfinder in resolving [a] factual dispute concerning jurisdiction).[1] A factual attack relies on matters outside the pleadings, such as testimony, affidavits, or declarations. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). So here, the question of whether StockX and Plaintiff "have agreed to submit [their] dispute to arbitration is an issue of law subject to judicial resolution." *Adams*, 689 F. Supp. 3d at 1152–53 (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)). The party asserting the agreement to arbitrate must prove its existence by a preponderance of the evidence.

---

[1] *See* Declaration of Alan McGrath dated October 17, 2025 ("Decl."). A sworn declaration from a StockX employee "satisfie[s] the burden of showing that the plaintiff had agreed to the Terms." *Newton v. Experian Info. Sols., Inc.*, No. 24-12398, 2025 WL 2102084, at *2 (11th Cir. July 28, 2025) (citing *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343 (11th Cir. 2025)).

*Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1347 (11th Cir. 2025) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

**B.    StockX And Plaintiff Agreed To Arbitrate.**

**1.    State-Law Principles Govern Contract Formation.**

Florida state law governs the threshold contract-formation inquiry. *See Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022) ("Because arbitration agreements are contracts, ordinary state law principles of contract formation apply.").[2] More specifically, "[f]ederal courts 'apply ordinary state-law principles that govern the formation of contracts' to determine whether there is a valid agreement to arbitrate under the FAA.'" *Adams*, 689 F. Supp. 3d at 1154 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *accord P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003). Under Florida law, "a party has a right to arbitrate where: (1) a valid, written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived." *Derriman v. Mizzen & Main LLC*, 710 F. Supp. 3d 1129, 1134 (M.D. Fla. 2023) (citations omitted). As to the first factor, the Court must consider whether "the contract containing the arbitration

---

[2] *See also* Fla. Stat. § 682.02(1) (2025) ("An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.").

clause" can be enforced in Florida. *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012). Therefore, the formation issue hinges on the validity of the parties' underlying agreement: StockX's Terms (eff. March 23, 2022).[3]

In this case involving electronic contract formation, the key factors are notice and manifestation of assent. Florida courts have uniformly found that "well-settled legal principles of contract formation suffice to decide cases, such as this one, involving contracts entered into and evidenced by electronic means." *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018); *see also Miami Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689 (Fla. 3d DCA 2025) ("If a website offers contractual terms to users, and a user engages in conduct that manifests assent to those terms, an enforceable agreement may be formed."). Generally, two types of contracts arise from online transactions – "clickwrap" agreements and "browsewrap" agreements:

> A "clickwrap" agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions. A "browsewrap" agreement occurs when a website merely provides a link to the Terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the

---

[3] As explained in Part II, *infra*, the contractual delegation clause forbids the Court from analyzing whether Plaintiff's TCPA claim falls within the scope of arbitrable issues under the Terms. There can be no serious debate regarding waiver because StockX promptly moved to compel arbitration. Even if waiver was contested, that issue would also be covered by the Terms' enforceable delegation clause. *See Lamonaco*, 141 F.4th at 1348–49.

> transaction without visiting the page containing the terms
> and conditions.

*MetroPCS*, 273 So. 3d at 1028 (citations and quotations omitted).

### 2. StockX's Hybrid Browsewrap Agreement Provides Reasonably Conspicuous Notice Of StockX's Terms.

When a party seeks to enforce an agreement more akin to a browsewrap (as opposed to a clickwrap), Florida law imposes a heightened burden. *See Miami Dolphins*, 410 So. 3d at 689. Courts will enforce such agreements "only where 'the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a *reasonably prudent person* on inquiry notice.' " *Id.* (quoting *MetroPCS*, 273 So. 3d at 1028 (emphasis added)). In a nutshell, "a browsewrap agreement may be valid even if the user never opens the terms or sees the full agreement, as long as the browsewrap agreement 'gives at least reasonable, constructive, or inquiry notice of the website's terms to the user, and the user exhibits unambiguous assent to the terms.' " *Falcon v. TelevisaUnivision Digital, Inc.*, 2024 WL 1492831, at *2 (M.D. Fla. Mar. 29, 2024) (quoting *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (cleaned up)). This framework serves a salutary purpose borne of blackletter contract law. First, it "avoids the unfairness associated with enforcing contractual terms that consumers never intended to accept." *Miami Dolphins*, 410 So. 3d at 689. Second, it reinforces the common law rule that "a person has no right to shut

his eyes or ears to avoid information[ ] and then say he has no notice." *Id.* (quoting *Sapp v. Warner*, 141 So. 124, 127 (Fla. 1932)).

The Internet agreement at issue in this suit does not fit precisely within the 'clickwrap–browsewrap' rubric. As of the date Plaintiff created her StockX account (Sept. 2, 2024), new users had two sign-up options. If a user signed up by entering her email address, such user was *required* to check a box next to a disclaimer that stated: "I have read and agree to the Terms and Conditions and Privacy Policy." *See* Decl. ¶¶ 8–9 & Ex. B. A user signing up via this email option could click the prominent "Sign Up" button – and thus create an account – *only if* she first clicked the checkbox. *Id.* Alternatively, a user could sign up via one of four preexisting online accounts – *i.e.*, Google, Apple, Facebook, or X.[4] *Id.* But a StockX user who chose this second sign-up method was not required to click the checkbox; rather, the account-creation process would commence by clicking one of the four trademarked icons on the webpage. *Id.* ¶ 9. StockX's records show that Plaintiff signed up via her Apple account, which means she was not required to check the acknowledgement box prior to creating her account. *Id.* ¶ 10. So, Plaintiff did not agree to a pure clickwrap.

Nor did she agree to a pure browsewrap. As applied to Plaintiff, StockX's sign-up page constitutes a ***hybrid*** browsewrap agreement, which courts in this

---

[4] The social media network formerly known as Twitter.

District have described as "browsewrap agreements that resemble clickwrap agreements in that they require the user 'to affirmatively acknowledge the agreement before proceeding with the use of the website,' often by clicking a button to create an account, sign up for a subscription, or complete an order." *Falcon*, 2024 WL 1492831, at *3 (citing *Temple*, 360 F. Supp. 3d at 1303–04). Although not a quintessential clickwrap, a hybrid browsewrap agreement still "weighs in favor of valid notice." *Temple*, 360 F. Supp. 3d at 1303 (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176–77 (9th Cir. 2014)).

Determining whether Plaintiff had constructive notice of StockX's Terms "requires a fact-based analysis." *Temple*, 360 F. Supp. 3d at 1302. In assessing the enforceability of hybrid browsewrap agreements, courts must analyze the "conspicuousness and placement" of hyperlinks to terms, notices of the terms, and the website's general design. *Id.* at 1302–03; *see also Falcon*, 2024 WL 1492831, at *3 (stating "browsewrap agreements are enforceable where the hyperlinks to the terms of use agreement are sufficiently conspicuous"). However, courts will not enforce browsewrap agreements "where the link to the website's terms are 'buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it.'" *Temple*, 360 F. Supp. 3d at 1303 (quoting *Nguyen*, 763 F.3d at 1177).[5] Substantial

---

[5] *See also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (no conspicuous notice where the hyperlink to the terms was "submerged" such that the user had to continue

Florida caselaw demonstrates Plaintiff and StockX provided "mutual assent to certain and definite contractual terms." *Matter of T&B Gen. Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987).

Under Florida law, StockX's hybrid sign-up page provides users with conspicuous notice of its Terms. "Courts in this District have consistently found that a statement informing a user that by proceeding he or she consents to a set of hyperlinked terms provides sufficient inquiry notice if the hyperlinks are conspicuously placed above the button that users must click to continue." *Falcon*, 2024 WL 1492831, at *3 (citing cases). Here, links to StockX's Terms and Privacy Policy "are underlined, indicating that they are hyperlinks." *See Derriman*, 710 F. Supp. 3d at 1140 (finding browsewrap notice conspicuous where hyperlink to defendant's terms was underlined and "placed directly above the sign-up button and set off from the text below it in a box of its own"). Further, the sentence regarding the applicability of StockX's Terms is in black font against a white background – appearing directly *above* the prominent "Sign Up" button and the notice text giving users the alternative option to "Sign up with" their Google, Apple, Facebook, or X account. Decl., Ex. B at 1. This eye-catching design mirrors strikingly similar cases where Florida federal courts have found hyperlinked terms to a hybrid browsewrap agreement

---

to scroll down the webpage, past the "download" button, to bring the hyperlink within her line of sight).

reasonably conspicuous.  *See, e.g., Bell v. Royal Seas Cruises, Inc.*, 2020 WL 5639947, at *6 (S.D. Fla. Sept. 21, 2020) (finding terms sufficiently conspicuous where website's notice text included hyperlinks directly above the 'Continue' button that users had to click to proceed with using the site); *Adams*, 689 F. Supp. 3d at 1156–57 (rejecting plaintiff's argument that the grey hyperlinked notice text should have been "bolder" and "larger" considering "the text's prominent placement proximately atop and contrasting with the dark 'CHECKOUT' button"); *Temple*, 360 F. Supp. 3d at 1304 (finding 'Terms and Conditions' hyperlink conspicuous enough to provide inquiry notice because it was "prominently displayed and located directly above the 'Get a Quote' button that a user click[ed] to complete his/her registration"); *Falcon*, 2024 WL 1492831, at *4 (finding conspicuous notice because bolded hyperlinks "were included in statements that informed users they must agree to the site's Terms of Use agreement to proceed" and "[t]hese statements appeared immediately above the buttons that users needed to click to continue using the site").  As in these cases, Plaintiff was cautioned that signing up indicated her acceptance to the contract available via the "Terms and Conditions" hyperlink.  Decl. ¶¶ 12–15.  This common design constitutes reasonably conspicuous notice.

The sign-up screen's layout of four buttons with different logos and color schemes – all directly *below* the Terms hyperlink, the "Sign Up" button, and the prefatory "Sign up with" text – does not undercut the reasonableness of the

notice.  These buttons plainly provided options for how Plaintiff could sign up for StockX because each distinctive logo was preceded by the "Sign up with" directive and appeared in close proximity to the sentence explaining the applicability of StockX's Terms – all on a single, uncluttered screen.  *See* Decl. ¶ 13 & Ex. B at 1.  A reasonably prudent Internet user would know she would be bound by StockX's Terms even if she used her Apple account to sign up for a StockX account.  *See Selden v. Airbnb*, 4 F.4th 148, 157 (D.C. Cir. 2021) ("A reasonable person would know that, by signing up, he would be agreeing to Airbnb's Terms *even if he used his Facebook account* to sign up.") (emphasis added); *Rainey v. A Place for Rover, Inc.*, 2022 WL 16942849, at *1–2 (C.D. Cal. July 18, 2022) (finding notice of browsewrap terms conspicuous where website presented plaintiff with a screen "that gave her the option to sign up by either directly inputting her email address or by linking various social media accounts" with sign-up buttons next to an explanatory sentence explaining she agreed to defendant's terms of service by signing up).

In sum, StockX's hybrid browsewrap agreement is enforceable because "the hyperlink to the terms and conditions is conspicuous enough to place the user on inquiry notice." *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. 4th DCA 2017).  Plaintiff could not have signed up without the underlined Terms hyperlink in her line of sight.  Decl. ¶¶ 13–15 & Ex. B at 1.  Indeed, the link appeared directly above the "Sign Up" buttons – it cannot be missed when

-17-

a user creates an account either via her email address or Apple account. *See Walmart*, 2025 WL 396453, at *3 (finding notice conspicuous where "Place order" button was directly below underlined hyperlink to defendant's terms); *Temple*, 360 F. Supp. 3d at 1304–05 (conspicuous notice where the terms hyperlink was located above the 'Get a Quote' button such that plaintiff must have brought the link "within his line of vision before viewing and proceeding to click the 'Get a Quote' button"); *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-374, Order Granting Defendant's Motion to Compel Arbitration at 4–5 (Fla. Cir. Ct. Aug. 29, 2023) (enforcing hybrid browsewrap contract where plaintiff registered her account by clicking "Continue with Apple" button directly above the statement: "By continuing, you agree to our Terms of Use").[6] StockX's sign-up screen passes muster under Florida law.

### 3. Plaintiff Unambiguously Assented To StockX's Terms And StockX's SMS Terms – Both Of Which Contain A Valid Arbitration Agreement

In addition to having inquiry notice of StockX's browsewrap agreement, Plaintiff assented to arbitration of her claims. First, she clicked the button displaying the Apple icon directly beneath the "Sign up with" directive to create her own StockX account via her Apple account. *See* Decl. ¶ 10. By clicking the Apple button, she unambiguously assented to StockX's Terms, including its

---

[6] Attached hereto as <u>Exhibit A</u> to <u>Exhibit 2</u>, the Declaration of David Poell dated October 17, 2025.

arbitration agreement.  *See, e.g.*, *Fontanez*, *supra*, at 4 ("By clicking 'Continue with Apple,' she assented to the Terms of Use."); *Derriman*, 710 F. Supp. 3d at 1141 (holding plaintiff assented to browsewrap agreement when "he clicked the button advertising a discount in exchange for joining the Mizzen and Main messaging service").  The fact she was not required to click the checkbox on the sign-up screen makes no difference, because the sentence stating "I have read and agree to the <u>Terms and Conditions</u> and <u>Privacy Policy</u>" was displayed above the large "Sign Up" button and the "Sign up with" message placed directly above the Apple icon.[7]  Decl. ¶ 12, Ex. B at 1.  As such, the legal significance of clicking on the Apple button was adequately explained by the clear statements immediately preceding it.  *See, e.g.*, *Kravets v. Anthropologie, Inc.*, 2022 WL 1978712, at *5 (S.D. Fla. June 6, 2022) (holding user assented to browsewrap terms where disclaimer was included above a button advertising free shipping in exchange for a user's agreement to receive emails and texts, *even though the plaintiff was not required to check a box* indicating she had read the terms and conditions).  As in *Kravets* and *Derriman*, StockX likewise "provided a sufficient explanation of the legal significance of clicking on [a] button in the statements immediately above it."  *Derriman*, 710 F. Supp.

---

[7] As discussed in Section I.B.2, *supra*, Plaintiff did not sign up via a clickwrap agreement. Therefore, the Court need only consider whether Plaintiff's assent sufficed for a browsewrap agreement.

3d at 1141.  Any reasonably prudent Internet user would realize that clicking a button to sign up for a StockX account would constitute assent to the Terms.

Second, StockX's records show Plaintiff also subscribed to receive text messages from StockX during her account-creation process.  After signing up via her Apple account, she would have seen a screen where she could enter her cell phone number and click a box appearing next to a message stating: "I agree to receive marketing messages from StockX at the number provided above, and that these texts may be sent using an autodialer. I understand that my agreement is not a condition of any purchase or of using the service." *See* Decl. ¶ 16.  A statement immediately below the checkbox invited her to view StockX's SMS Terms of Service ("SMS Terms") by clicking an underlined hyperlink.  *Id.* ¶¶ 16–17.   StockX's records confirm that Plaintiff entered her cell phone number, *checked the box*, and clicked the "Agree" button on the text-message prompt.  *Id.* ¶ 18.   Seconds after submitting this form, an automated text message was sent to her cell phone confirming her opt-in to receive automated text messages from StockX.  *Id.* ¶¶ 16, 18, Ex. B at 4–5.

Here, there can be no question, considering this "double-opt in" process, that Plaintiff understood the legal significance of her actions and agreed to arbitrate this dispute with StockX.  *See Kravets*, 2022 WL 1978712, at *6 ("This undisputed 'double-opt in' process establishes that Plaintiff knew or should have known of the legal significance of her actions and was manifestly

-20-

assenting [to] the Text Terms and the accompanying Arbitration Provision."); *Derriman*, 710 F. Supp. 3d at 1141 (holding plaintiff assented to arbitration clause because he confirmed his subscription to recurring text messages). Because Plaintiff unambiguously indicated her assent to (1) StockX's Terms (when she created her account), and (2) StockX's SMS Terms (when she affirmatively opted in to receive text messages), she is subject to both written agreements and the arbitration clauses contained in each agreement.[8]  As the underlying dispute concerns StockX's alleged violation of the TCPA – based on the transmission of purportedly unsolicited commercial text messages – it is clear that she would have to arbitrate her TCPA claim under either agreement.

## II.  The Arbitrator, Not This Court, Is Charged With Deciding Whether This Dispute Falls Within The Scope Of The Parties' Arbitration Agreement.

While the parties have an enforceable arbitration agreement, the Court need not – and therefore should not – assess the scope of that agreement, because they permissibly agreed to have the arbitrator undertake that analysis in the first instance.  Where, as here, the arbitration agreement delegates the threshold issue of arbitrability to the arbitrator, the Court *must* compel arbitration and allow the arbitrator to decide whether the claims fall within

---

[8] SMS Terms of Service's arbitration provision applies to "any and all disputes or claims that have arisen or may arise between [user] and StockX relating in any way to or arising out of the SMS Terms or [user's] use of or access to the [SMS] Service."  *See* StockX SMS Terms of Service § 5 (eff. Aug. 2, 2023), attached as <u>Exhibit C</u> to the McGrath Decl.

the scope of the arbitration agreement.  *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce.").  Where, as here, "a delegation clause is 'clear and unmistakable,' courts must respect it – even if they would otherwise view the issue as one for judicial resolution." *Lamonaco*, 141 F.4th at 1349 (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–69 (2019)); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024).  This rule is ironclad.

The arbitration agreement in StockX's Terms expressly delegates gateway issues of arbitrability to the arbitrator:

> Other than issues related to the CLASS ACTION WAIVER, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of the Terms including, but not limited, any claim that all or any part of this Agreement to Arbitrate or the Terms is void or voidable.

(Terms, § 14(b).)[9]  Such language is a paradigmatic example of a clear and unmistakable delegation of authority to the arbitrator.  *See Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017) (finding materially identical delegation clause enforceable); *Orellana v. Roblox Corp.*, 769 F. Supp. 3d 1273, 1289 (M.D. Fla. 2025) (finding delegation clauses clearly and unmistakably

---

[9] StockX' SMS Terms of Service contain a materially identical delegation clause to that of the Terms.  *See* Decl., Ex. C § 5(b).

evince the parties' intent to arbitrate all gateway issues because both agreements require arbitration of "any dispute").

The delegation clause also meets the clear-and-unmistakable standard for a separate reason – it incorporates the AAA's Consumer Rules. (*See* Terms, § 14(b).) The Florida Supreme Court and the Eleventh Circuit have held that an arbitration agreement's express incorporation of the AAA's rules "clearly and unmistakably evidences the parties' intent to empower an arbitrator to resolve questions of arbitrability." *Airbnb, Inc. v. Doe*, 336 So. 3d 698, 703, 705 (Fla. 2022); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1298 (11th Cir. 2022) ("[A]n incorporation of the AAA's rules giving an arbitrator the power to rule on his or her own jurisdiction constitutes a clear and unmistakable delegation of questions of arbitrability.") (quotations omitted).[10] And, courts have consistently enforced StockX's delegation clause. *See In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 878–79 (6th Cir. 2021); *Valiente v. StockX, Inc.*, 645 F. Supp.3d 1331, 1341–42 (S.D. Fla. 2022). As in those cases, the Court must "respect the parties' decision as embodied in the contract" and compel arbitration here too. *Henry Schein*, 586 U.S. at 71. And that also means the Court is forbidden from delving into the enforceability of the Terms' arbitration agreement – including whether it is unconscionable.

---

[10] All of the federal Courts of Appeals that have considered this question concur. *See Airbnb, Inc.*, 336 So. 3d at 703–04 (citing cases).

*See In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th at 886 ("Because a contract exists and the delegation provision itself is valid, we have 'no business weighing the merits' of any challenge to the arbitration agreement or the [online] Terms." (quoting *Henry Schein*, 586 U.S. at 68)).

Even if the Court decided the arbitrability of Plaintiff's individual TCPA claim (though it should not), that claim clearly falls within the scope of the Terms' arbitration agreement. The FAA provides that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved *in favor* of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (emphasis added). There are no doubts here.

The scope of the arbitration agreement is broad. The agreement covers "any and all disputes or claims that have arisen or may arise between you and StockX relating in any way to or arising out of the Terms or your use or access to the Services." Decl., Ex. A § 14. Plaintiff's TCPA claim is based on her alleged receipt of unsolicited text messages. *See* Complaint ¶¶ 26–34. And the transmission of such texts naturally arises from her creation of a StockX account. *See* Decl. ¶¶ 15–18. As such, her TCPA claim comfortably falls within the scope of StockX's applicable Terms. *See, e.g.*, *Temple*, 360 F. Supp. 3d at 1306–07 (holding TCPA claim fell within scope of broadly worded arbitration clause); *Derriman*, 710 F. Supp. 3d at 1142 (stating, in dicta, that Florida

Telephone Solicitation Act claim arising from plaintiff's alleged receipt of unsolicited text messages was arbitrable under parties' contract).

## <u>CONCLUSION</u>

For the foregoing reasons, StockX LLC respectfully requests that this Court grant its Motion to Compel Arbitration, and dismiss this civil action for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).  StockX further requests that this action be stayed, in its entirety, pending the outcome of the arbitration.  *See Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024).

Dated:  October 17, 2025

Respectfully submitted,

By: */s/ David M. Poell*
David M. Poell (*admitted pro hac vice*)
Kari M. Rollins (*pro hac vice forthcoming*)
SHEPPARD MULLIN RICHTER & HAMPTON LLP
321 North Clark Street, 31st Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
dpoell@sheppardmullin.com
krollins@sheppardmullin.com

John M. Brennan, JR.
Florida Bar No. 0098456
GRAYROBINSON, P.A.
301 E. Pine Street, Suite 1400
Orlando, Florida 32802-3068
Tel: (407) 843-8880
Fax: (407) 244-5690
John.Brennan@Gray-Robinson.com

*Counsel for Defendant StockX LLC*

## CERTIFICATE OF CONFERRAL

Pursuant to M.D. Fla. Local Rule 7.1(a)(3)(B), on October 17, 2025, the undersigned counsel for StockX LLC conferred telephonically with Plaintiff's counsel, Avi Kaufman, regarding the relief sought in this Motion.  Mr. Kaufman stated that Plaintiff opposes the relief requested herein.

/s/ *David M. Poell*

## CERTIFICATE OF SERVICE

The undersigned counsel for StockX LLC certifies that, on this 17th day October 2025, a true and correct copy of the foregoing document was filed using this Court's CM/ECF electronic filing service, which effects service on all counsel of record in this matter.

/s/ *David M. Poell*